UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

In re:                          )
                                )
                                )      Case no:25-20053
TWO RIVERS CATTLE FEEDERS, INC.,)
                                )      Chapter 12
                                )
                    Debtor.     )

## PLAN OF ADJUSTMENT OF DEBTS OF A FAMILY FARMER
## WITH REGULAR INCOME

The Debtor, Two Rivers Cattle Feeders, Inc. pursuant to § 1221 of Title 11 of the United States Code, propose the following Plan of Adjustment of Debts of a Family Farmer with Regular Income (the "Plan").

### DEFINITIONS

The following terms when used in this Plan shall, unless the context otherwise requires, have the following meanings.

"Bankruptcy Code":  Title 11 of the United States Code.

"Chapter 12": Chapter 12 of the Bankruptcy Code.

"Court":  The United States Bankruptcy Court for the Eastern District of Missouri.

"Confirmation":  The entry by this Court of a final and non-appealable order confirming the Plan in accordance with Chapter 12 of the

(L.F. 27 Rev. 12/09)

Bankruptcy Code.

"Effective Date":  The date of entry by this Court of a final and non-appealable order approving and confirming the Debtors' Chapter 12 Plan.

## ARTICLE I
## EARNINGS SUBMITTED FOR EXECUTION OF THE PLAN

The Debtor's plan is to conduct a cattle feeding and backgrounding operation. The Debtor's net income, after deducting the payments required under the Plan to creditors and to the Chapter 12 Trustee ("Trustee") is sufficient to fund this Plan.

The Debtor has on hand the sum of $24,000 from its operations.  This does not include $100,000 which the Debtor is scheduled to receive from its bi-monthly billing to its feedlot customers. The Debtor has accounts payable of $70,000. The Debtor has approximately 3000 cattle at the feed lot as of the filing of this plan. Debtor's income comes from yardage, markup on feed and veterinary medicine and other shoot charges and processing fees. The Debtor is subject to a cash collateral order which it also makes adequate protection payments to secured creditors Exchange Bank and the SBA. These payments will continue until Confirmation at which time the adequate protection payments will cease, and the Debtor will begin making plan payments.

(L.F. 27 Rev. 12/09)

Any excess net disposable income after the deductions set forth above of the Debtor and after all expenses and plan payments referenced herein shall be paid to the Trustee for distribution to unsecured creditors.  The Debtors' projected income and expenses are summarized on Exhibit A attached to the Plan. The Debtors' projected Plan payments are summarized on Exhibit B attached to the Plan.  The Debtors' liquidation analysis is summarized on Exhibit C attached to the Plan.

## ARTICLE II
## CLAIMS & INTERESTS DEALT WITH UNDER THE PLAN

2.1   <u>Trustee Fees.</u>  The Trustee shall receive as compensation for his services a fee of five percent (5%) of payments from the Debtors payable to the Trustee at the time payments are made to creditors, plus reasonable attorneys fees and expenses allowed by the Court, pursuant to § 326(b) of the Bankruptcy Code and L.R. 2016-4.  Said fees shall apply to all payments made on all pre-petition debt.  Post-petition farming payments both accruing and made post petition, including landlord lease payments and repayment of any crop input liens both accruing and made post petition, are not subject to a Trustee fee. Said Trustee fee shall be in addition to the amount paid for payments on secured claims, with a Trustee fee of 2.5% being deducted from any proceeds derived

Παγε 3

from any future sales of real estate or other liquidations.

2.2   Other Priority Claims.   All other claims entitled to priority under § 507 of the Bankruptcy Code will be paid in full.   The Debtor is aware of the following priority claims:

a.   Personal and real property taxes in the amount of zero;

b.   Federal/State income taxes for 2023 of approximately $282,000; and

c.   The balance due on the Debtors' attorney's fees, with a $30,800 retainer having been paid by the Debtors, which would be a credit against any fees to be paid in this Plan.   Counsel for the Debtors estimates the balances due on fees, after applying the retainer, will be approximately $25,000.

2.3   Treatment of Priority Claims.

a.   The Missouri Department of Revenue has an allowed priority tax claim in the amount of $39,706.23 stemming from unpaid income tax.   The Debtor has filed its 2024 individual income tax return.   The balance due on the 2024 return, if any, will be paid, without interest, to the Missouri Department of Revenue no later than November 1, 2025. The Debtor will make

Παγε 4

60 equal annual installments on the Missouri Department of Revenue's priority tax claim commencing 15 days after Confirmation. Interest will accrue on the priority tax claim commencing 15 days from Confirmation and will be included in the installment payment of $805.10 per month. The Internal Revenue Service has an allowed priority tax claim in the amount of $242,248.65 stemming from unpaid income tax. The Debtor has filed its 2024 individual income tax return. The balance due on the 2024 return, if any, will be paid, without interest, to the Internal Revenue Service no later than November 1, 2025. The Debtor will make 60 equal annual installments on the Internal Revenue Service's priority tax claim commencing 15 days after Confirmation. Interest will accrue on the priority tax claim commencing 15 days from Confirmation and will be included in the installment payment of $4,796.81 per month. In the event that the Internal Revenue Service and the Missouri Department of Revenue's priority tax claims and the Debtor's 2024 individual income tax return are not paid in accordance with the terms of the

Page 5

Confirmation order, the Debtor will be in default. The Internal Revenue Service and the Missouri Department of Revenue will provide the Debtor with written notice of the default by mail.  If the default is not cured within fourteen (14) days after notification, the entire amount shall at once become due and payable without further notice. The priority creditors may thereafter proceed with either or all of the following remedies: 1) enforce the entire amount of its claim; 2) exercise any and all its rights and remedies under State or Federal Law; (3) seek such relief as may be appropriate in this Court.

b.    Attorneys fees will be paid within sixty (60) days of approval by the Court, unless the Debtor and the Debtor's attorney agree to payment on a different schedule.

c.    The attorneys fees incurred by the Trustee in this matter are projected to be approximately _____.  Said fees shall be paid within thirty (30) days of the date on which the Court approves the application for allowance and payment of those fees, unless the parties agree otherwise.

Παγε 6

2.4   <u>Treatment of Secured Claims.</u>  The Debtor believes that the value, as of the effective date of the Plan, of property to be distributed by the Trustee or the Debtor under the Plan on account or each allowed secured claim, is not less than the allowed amount of such claim.

ARTICLE III
<u>SECURED CLAIMS</u>

3.1   <u>*"Secured Claim 1"*</u> – Exchange Bank is a secured creditor with debts secured by the Debtor's land, buildings, farm equipment, vehicles, cash and accounts which the Debtor has scheduled with a liquidation secured value of $2,500,000.00, although the secured claim as filed shows a value of $2,255,702.22 and balance due on the debt to Exchange Bank as of the date of filing, in the amount of $2,255,702.22.  For the purposes of this plan, the Debtor will treat this claim as fully secured to the extent of the claim balance only. Adequate protection payments made by the Debtor have reduced the claim to $2,250,000.00.

The claim of Exchange Bank in the amount of $2,250,000 shall be paid as a fully secured claim at the interest rate of 6% per annum, for a 20 year amortization, which is a monthly payment in the amount of $16,123.99, with the first payment to be made 15 days after Confirmation and a like amount on the same day of each subsequent month.   The last payment shall extend beyond the

Παγε 7

term of the Plan and shall pay the unpaid interest and principal.

Exchange Bank shall retain its lien on the subject collateral until the secured indebtedness is paid. The Debtor shall maintain insurance naming Exchange Bank as a loss payee to the extent or greater of the recited value against all peril, loss and theft with this current policy or evidence of such insurance in the hands of Exchange Bank at all times while an indebtedness with Exchange Bank exists and such insurance shall be with a company rated at least B+ or better in the Best Guide. The Debtor shall maintain the collateral in a condition satisfactory to Exchange Bank and shall permit inspection of the collateral within 2 business days of such a request.

Upon default of any payment or agreement or obligation of the Debtor in favor of Exchange Bank, Exchange Bank shall file a notice of default with the Court and serve the notice on the Trustee, the Debtor, and the attorney for the Debtor, and if said default is not cured within twenty-one (21) days from the mailing of said notice, or if the Debtor does not contest the validity of the default by a filing in the Bankruptcy Court, Exchange Bank shall be allowed to send the Court, *ex parte*, a proposed order terminating the automatic stay as to Exchange Bank's collateral. Only one of such cure or notice shall be provided in the event of a default occurring as a result of nonpayment.

The Debtor will account to the Trustee for post-petition payments and remit to the Trustee the sum of 5% as a Trustee fee for the post-petition

Παγε 8

payments on the pre-petition debt.

3.2   *"Secured Claim 2"* -   The claim of the SBA is secured by a second priority interest in the Debtor's land, buildings, farm equipment, vehicles, cash and accounts which the Debtor has scheduled with a liquidation secured value of zero, with a balance due on the debt to the SBA, as of today, in the amount of $500,000.00.   The SBA claims the value of the collateral to be $500,000.   The Debtor has agreed with the SBA that its debt shall be secured to the extent of $500,000 collateral value.

The claim of the SBA will be paid according to the existing terms of its Note, at the interest rate contained in the Note and as amortized under the Note of the SBA, for the remaining period of the original 30 year amortization, which is a monthly payment in the amount of $2,518.00, with the next payment to be made as scheduled in the Note and a like amount on the same day of each subsequent month.   The last payment shall extend beyond the term of the Plan and shall pay the unpaid interest and principal.

The SBA shall retain its lien on the subject collateral until the secured indebtedness is paid.   The Debtor shall maintain insurance naming the SBA as a loss payee to the extent or greater of the recited value against all peril, loss and theft with this current policy or evidence of such insurance in the hands of the SBA at all times while an indebtedness with the SBA exists and such insurance shall be with a company rated at least B+ or better in the Best

(L.F. 27 Rev. 12/09)

Guide.  The Debtor shall maintain the collateral in a condition satisfactory to the SBA and shall permit inspection of the collateral within 2 business days of such a request.

Upon default of any payment or agreement or obligation of the Debtors in favor of SBA, SBA shall file a notice of default with the Court and serve the notice on the Trustee, the Debtor, and the attorney for the Debtor, and if said default is not cured within twenty-one (21) days from the mailing of said notice, or if the Debtor does not contest the validity of the default by a filing in the Bankruptcy Court then the SBA shall be allowed to send the Court, *ex parte*, a proposed order terminating the automatic stay as to the SBA's collateral.  Only one of such cure or notice shall be provided in the event of a default occurring as a result of nonpayment.

The Debtor will account to the Trustee for post-petition payments and remit to the Trustee the sum of 5% as a Trustee fee for the post-petition payments on the pre-petition debt.

3.3    ***Secured Claim 3*** - The claim of Ag Direct is secured by a purchase money lien on a 2016 Rotomix Feed Truck in the net amount of $10,000,00 as of the date the case was filed.  This debt is being treated as fully secured.

The claim of Ag Direct shall be modified to pay the balance as amortized over 6 years at an interest rate of 6 per cent per annum. The Debtor shall make monthly payments in the amount of $165.73, which shall be paid to the Trustee

Παγε 10

(L.F. 27 Rev. 12/09)

for the benefit of Ag Direct.

Ag Direct shall retain its lien on the subject collateral until the secured indebtedness is paid. The Debtor shall maintain insurance naming Ag Direct as a loss payee to the extent or greater of the recited value against all peril, loss and theft with this current policy or evidence of such insurance in the hands of Ag Direct at all times while an indebtedness with Ag Direct exists, and such insurance shall be with a company rated at least B+ or better in the Best Guide. The Debtor shall maintain the collateral in a condition satisfactory to Ag Direct and shall permit inspection of same within 2 business days of such request.

Upon default of any payment or agreement or obligation of the Debtor in favor of Ag Direct, Ag Direct shall file a notice of default with the Court and serve the notice on the Trustee, the Debtor, and the attorney for the Debtor, and if said default is not cured within twenty-one (21) days from the mailing of said notice, or the Debtor does not contest the validity of the default by a filing in the Bankruptcy Court Ag Direct shall be allowed to send the Court, *ex parte*, a proposed order terminating the automatic stay as to Ag Direct's collateral. Only one of such cure or notice shall be provided in the event of a default occurring as a result of nonpayment.

The Debtor will account to the Trustee for post-petition payments and remit to the Trustee the sum of 5% as a Trustee fee for the post-petition

Παγε 11

payments on the pre-petition debt.

3.4  ***Secured Claim 4*** - The claim of Central Bank is secured by a purchase money lien on a 2020 Chevy Quarter Ton Deisel Truck in the net amount of $29,805.64 as of the date the case was filed.  This debt is being treated as fully secured.

The claim of Central Bank shall be modified to pay the balance as amortized over 6 years at an interest rate of 6 per cent per annum. The Debtor shall make monthly payments in the amount of $493.97, which shall be paid to the Trustee for the benefit of Central Bank.

Central Bank shall retain its lien on the subject collateral until the secured indebtedness is paid.  The Debtor shall maintain insurance naming Central Bank as a loss payee to the extent or greater of the recited value against all peril, loss and theft with this current policy or evidence of such insurance in the hands of Central Bank at all times while an indebtedness with Central Bank exists, and such insurance shall be with a company rated at least B+ or better in the Best Guide.  The Debtor shall maintain the collateral in a condition satisfactory to Central Bank and shall permit inspection of same within 2 business days of such request.

Upon default of any payment or agreement or obligation of the Debtor in favor of Central Bank, Central Bank shall file a notice of default with the Court and serve the notice on the Trustee, the Debtor, and the attorney for the

Παγε 12

Debtor, and if said default is not cured within twenty-one (21) days from the mailing of said notice, or the Debtor does not contest the validity of the default by a filing in the Bankruptcy Court Central Bank shall be allowed to send the Court, *ex parte*, a proposed order terminating the automatic stay as to Central Bank's collateral.  Only one of such cure or notice shall be provided in the event of a default occurring as a result of nonpayment.

The Debtor will account to the Trustee for post-petition payments and remit to the Trustee the sum of 5% as a Trustee fee for the post-petition payments on the pre-petition debt.

3.5   *"Secured Claim 5"* - The second claim of Central Bank is secured by a purchase money security interest in 2023 GMC Yukon Truck which the Debtor believes to be worth $55,000, with a balance due on the debt to Central Bank, as of today, in the amount of $70,602.00.  Central Bank claims the value of the collateral to be $70,602.

The claim of Central Bank shall be modified to pay the fair market value of a balance due on the debt of $55,000, at the interest rate of 6% per annum in equal monthly payments of $911.51 amortized over 6 years. The last payment shall extend beyond the term of the Plan and shall pay the unpaid interest and principal.

Central Bank shall retain its lien on the subject collateral until the secured indebtedness is paid.  The Debtor shall maintain insurance naming

Page 13

(L.F. 27 Rev. 12/09)

Central Bank as a loss payee to the extent or greater of the recited value against all peril, loss and theft with this current policy or evidence of such insurance in the hands of Central Bank at all times while an indebtedness with Central Bank exists and such insurance shall be with a company rated at least B+ or better in the Best Guide. The Debtor shall maintain the collateral in a condition satisfactory to Central Bank and shall permit inspection of the collateral within 2 business days of such a request.

Upon default of any payment or agreement or obligation of the Debtor in favor of Central Bank, Central Bank shall file a notice of default with the Court and serve the notice on the Trustee, the Debtor, and the attorney for the Debtor, and if said default is not cured within twenty-one (21) days from the mailing of said notice, or if the Debtor does not contest the validity of the default by a filing in the Bankruptcy Court then Central Bank shall be allowed to send the Court, *ex parte*, a proposed order terminating the automatic stay as to the Central Bank's collateral. Only one of such cure or notice shall be provided in the event of a default occurring as a result of nonpayment.

The Debtor will account to the Trustee for post-petition payments and remit to the Trustee the sum of 5% as a Trustee fee for the post-petition payments on the pre-petition debt.

3.6    *"Secured Claim 6"* – Highland Hill Capital, LLC a merchant cash advance lender filed a purported secured claim in the amount of $1,138,492.32.

(L.F. 27 Rev. 12/09)

Debtor disputes the validity of this claim and any purported security interest. Debtor will object to this claim. In the event that the Court allows this claim as either a secured or unsecured claim Debtor will make payments as agreed upon with this creditor or pursuant to Court Order.

ARTICLE IV
UNSECURED CLAIMS

The Debtor believes it may have $90,000 in equity in its property which could be distributed if the Debtor prevails on its objection to the Highland Hill claim. The Trustee may express his position that the equity is higher if the Highland Hill secured claim is denied in full. The Debtor and the Trustee will attempt to compromise their dispute in this regard. The Debtor will tentatively submit to the Trustee annual payments of $30,000, beginning July 1, 2026, for a total sum of $90,000 pending the result off the Highland Hill claim objection. The Trustee will distribute these payments to the unsecured creditors.

In addition, excess net disposable income, as set forth in Article I, will be paid annually to the Trustee for pro-rata distribution to creditors based on unsecured claims filed. The Debtor shall prepare and file its annual tax returns, providing a copy to the Trustee, and shall file quarterly reports with the Trustee in a form substantially similar to that required in the U.S. Trustee Chapter 12 Handbook, so that the Trustee will be provided with an adequate accounting of the net disposable income.

Παγε 15

(L.F. 27 Rev. 12/09)

## ARTICLE V
## LEASES AND EXECUTORY CONTRACTS

5.1 Northland Capital Financial Services, LLC ("Northland")'s ("Creditor") treatment shall be as follows:

a.  The Creditor is the true owner of a silage chopper and attachments, (the "Equipment"). The Equipment is the subject of one (1) lease agreement (hereinafter "Lease Agreement").

b.  The Creditor has filed its proof of claim in the amount of $299,642.66, which includes all payments due under the Lease Agreement, plus accruing post-petition attorney's fees and costs.

c.  It is agreed that the Debtor hereby assumes and accepts the Lease Agreement, as modified for payment only as described in paragraph 4 herein, pursuant to § 365 of the Bankruptcy Code and will fulfill all of the terms of the Lease Agreement.

d.  The parties agree and stipulate that the Debtor shall make its first annual payment in the amount of $48,705.96 on February 1, 2026. The Debtor also agrees to exercise their lease buyout provision, and The Creditor will allow the exercise of that buyout provision for the sum of $101.00 plus all reasonable attorney's fees and costs due on or before the final residual payment under the Lease Agreement. All payment will be made through the offices of the Trustee and any and all Trustee's fees will be paid by the Debtor. The Trustee will deliver payments received hereunder directly to the

Παγε 16

(L.F. 27 Rev. 12/09)

Creditor Northland, at 333 33rd Avenue South, St. Cloud, MN 56301.

e.   If these proceedings are converted to any other chapter of the Bankruptcy Code, this agreement shall apply in the converted case.  If 1) the bankruptcy proceedings are dismissed for any reason; 2) following thirty (30) days notice of default filed with the Court and served upon the Trustee, the Debtor, and the attorney for the Debtor, the Debtor fails to make a scheduled payment as set forth within the Lease Agreement or cure any past-due payment; or 3) there is any other breach or default of this agreement or the Lease Agreement, this agreement and the attached Lease Agreement shall be deemed in default, and the Creditor shall be allowed to send the Court, *ex parte*, a proposed order terminating the automatic stay as to the Creditor's collateral.  The Debtor further agree to voluntarily turn over the Equipment in the event of default.  Only one of such cure or notice shall be provided in the event of a default occurring as a result of nonpayment.

f.   The parties agree that the treatment of the Creditor set forth herein will be made a part of the Debtor's Plan and any amended plan presented to the Court in these proceedings or any other bankruptcy proceedings in which the Debtor is a debtor.

g.   The Debtor agrees to maintain insurance coverage on the Equipment pursuant to the terms of the Lease Agreement and supply the Creditor with proof of said insurance.

Παγε 17

(L.F. 27 Rev. 12/09)

h.   The terms and provisions of the Lease Agreement are made a part of this stipulation, and the Debtor agrees to comply with all terms thereof.  Any conflicts between the attached Lease Agreement and this stipulation shall be resolved in favor of the Lease Agreement.

i.   The Debtor agrees that all notices, including notices of default, may be sent to the Debtor's counsel by regular United States mail.

5.2   Financial Pacific Leasing ("Creditor")'s treatment shall be as follows:

a.   The Creditor is the true owner of certain leased equipment, (the "Equipment").  The Equipment is the subject of one (1) lease agreement (hereinafter "Lease Agreement").

b.   The Creditor has filed its proof of claim in the amount of $23,444.47, which includes all payments due under the Lease Agreement, plus accruing post-petition attorney's fees and costs.

c.   It is agreed that the Debtor hereby assumes and accepts the Lease Agreement, as modified for payment only as described in paragraph 4 herein, pursuant to § 365 of the Bankruptcy Code and will fulfill all of the terms of the Lease Agreement.

d.   The parties agree and stipulate that the Debtors shall continue to make their monthly payment in the amount of $2,079.00 per month. The Debtor also agrees to exercise its lease buyout provision, and The Creditor will allow the exercise of that buyout provision as referenced in the lease due on or before the final residual payment under the Lease

Παγε 18

Agreement. All payment will be made through the offices of the Trustee and any and all Trustee's fees will be paid by the Debtor.   The Trustee will deliver payments received hereunder directly to the Creditor at 3455 S. 344th Way, Ste. 300, Auburn, WA 98001.

e.    If these proceedings are converted to any other chapter of the Bankruptcy Code, this agreement shall apply in the converted case.   If 1) the bankruptcy proceedings are dismissed for any reason; 2) following thirty (30) days notice of default filed with the Court and served upon the Trustee, the Debtor, and the attorney for the Debtor, the Debtor fails to make a scheduled payment as set forth within the Lease Agreement or cure any past-due payment; or 3) there is any other breach or default of this agreement or the Lease Agreement, this agreement and the attached Lease Agreement shall be deemed in default, and the Creditor shall be allowed to send the Court, *ex parte*, a proposed order terminating the automatic stay as to the Creditor's collateral.   The Debtor further agrees to voluntarily turn over the Equipment in the event of default.   Only one of such cure or notice shall be provided in the event of a default occurring as a result of nonpayment.

f.    The parties agree that the treatment of the Creditor set forth herein will be made a part of the Debtor's Plan and any amended plan presented to the Court in these proceedings or any other bankruptcy proceedings in which the Debtor are debtors.

(L.F. 27 Rev. 12/09)

g.   The Debtor agrees to maintain insurance coverage on the Equipment pursuant to the terms of the Lease Agreement and supply the Creditor with proof of said insurance.

h.   The terms and provisions of the Lease Agreement are made a part of this stipulation, and the Debtor agrees to comply with all terms thereof. Any conflicts between the attached Lease Agreement and this stipulation shall be resolved in favor of the Lease Agreement.

i.   The Debtor agrees that all notices, including notices of default, may be sent to the Debtor's counsel by regular United States mail.

5.3 Stearns Bank ("Creditor")'s treatment shall be as follows:

a.   The Creditor is the true owner of certain leased equipment, (the "Equipment"). The Equipment is the subject of one (1) lease agreement (hereinafter "Lease Agreement").

b.   The Creditor did not file a proof of claim, but Debtor believes the balance due is approximately $20,000, which includes all payments due under the Lease Agreement, plus accruing post-petition attorney's fees and costs.

c.   It is agreed that the Debtor hereby assumes and accepts the Lease Agreement, as modified for payment only as described in paragraph 4 herein, pursuant to § 365 of the Bankruptcy Code and will fulfill all of the terms of the Lease Agreement.

d.   The parties agree and stipulate that the Debtor shall continue to make its monthly payment in the amount of $600.00 per month. The Debtor also agrees to exercise its lease buyout provision, and The Creditor will allow the exercise of that

(L.F. 27 Rev. 12/09)

buyout provision as referenced in the lease due on or before the final residual payment under the Lease Agreement. All payment will be made through the offices of the Trustee and any and all Trustee's fees will be paid by the Debtor. The Trustee will deliver payments received hereunder directly to the Creditor at an address to be provided.

e.   If these proceedings are converted to any other chapter of the Bankruptcy Code, this agreement shall apply in the converted case.  If 1) the bankruptcy proceedings are dismissed for any reason; 2) following thirty (30) days notice of default filed with the Court and served upon the Trustee, the Debtor, and the attorney for the Debtor, the Debtor fails to make a scheduled payment as set forth within the Lease Agreement or cure any past-due payment; or 3) there is any other breach or default of this agreement or the Lease Agreement, this agreement and the attached Lease Agreement shall be deemed in default, and the Creditor shall be allowed to send the Court, *ex parte*, a proposed order terminating the automatic stay as to the Creditor's collateral.  The Debtor further agrees to voluntarily turn over the Equipment in the event of default.  Only one of such cure or notice shall be provided in the event of a default occurring as a result of nonpayment.

f.   The parties agree that the treatment of the Creditor set forth herein will be made a part of the Debtor's Plan and any amended plan presented to the Court in these proceedings or any other

Παγε 21

(L.F. 27 Rev. 12/09)

bankruptcy proceedings in which the Debtor is a debtor.

g.   The Debtor agrees to maintain insurance coverage on the Equipment pursuant to the terms of the Lease Agreement and supply the Creditor with proof of said insurance.

h.   The terms and provisions of the Lease Agreement are made a part of this stipulation, and the Debtor agrees to comply with all terms thereof.  Any conflicts between the attached Lease Agreement and this stipulation shall be resolved in favor of the Lease Agreement.

i.   The Debtor agrees that all notices, including notices of default, may be sent to the Debtor's counsel by regular United States mail.

## ARTICLE VI
### VESTING OF PROPERTY, PAYMENT METHOD, AND LIEN RETENTION

Except as otherwise provided in the Plan, the property of the estate shall vest in the Debtor upon confirmation of the Plan.

All payments are to be made to the Trustee through the life of the Plan.

All secured creditors shall retain their liens to the extent of the value of the collateral pledged as security.

## ARTICLE VII
### CONTINUED OPERATION

The Debtor will continue to operate its business during the life of the Plan and thereafter.

The Debtor shall be authorized to collect all monies due to it and use

Παγε 22

(L.F. 27 Rev. 12/09)

said collected funds in their Chapter 12 farming operation except as set forth herein.  None of said funds shall be required to be turned over to the Trustee unless a separate order of court shall be entered.

## ARTICLE VIII
## DURATION OF PLAN

The Plan payments shall be made for a period of three years, unless the Debtor shall submit to the Trustee sufficient funds to pay in full the priority and unsecured claims herein.  Should the Debtor submit to the Trustee sufficient funds to pay the priority and unsecured claims herein in full, no further payments shall be due through the Trustee, and this Plan shall be completed and this case closed.

## ARTICLE IX
## LIQUIDATION

The Debtor believes there are significant disputes concerning the equity available for their unsecured creditors in the event of a Chapter 7 liquidation and, therefore, provide no guarantee of payment to unsecured creditors other than the $30,000 per year referenced in this plan.


 /s/ Chad Duncan_____
President of Debtor

(L.F. 27 Rev. 12/09)

_/s/ David M. Dare_____,
Attorney for Debtors


_____
_____,
Chapter 12 Trustee

Παγε 24

## EXHIBIT A

### Debtors' Income and Expense Projections

**Income**

| | |
|---|---|
| Gross Income from Feedlot | $3,400,000 |
| Feed | $2,300,000 |
| Gross Profit | $1,100,000 |

**Expenses**

| | |
|---|---|
| Payroll | $338,000 |
| Insurance | $92,000 |
| Utilities | $12,000 |
| Repairs | $50.000 |
| Fuel | $80,000 |
| Contractors | $40,000 |
| Taxes | $12,000 |
| | _____ |
| Total | $624,000 |

| | |
|---|---|
| Annual projected funds | $476,000 |
| | _____ |

(L.F. 27 Rev. 12/09)

EXHIBIT B

Debtors' Plan Calculations

| | |
|---|---|
| Secured Creditor payments monthly | $20,613.20 |
| Lease payments monthly | $6,737.83 |
| Priority payments monthly | $5,601.91 |
| Unsecureds | $2,500.00 |
| Total | $35,452.94 |
| Trustee fee | $1,772.64 |
| | |
| Total | $37,225.58 |
| | |
| Net Income after payments and fees | $2,441.08 |
| | |
| Attorney's Fees Debtor and Trustee | $2,966.66 |
| | |
| Balance | $0 |

EXHIBIT C

Debtors' Liquidation Analysis - date of confirmation

| Collateral Value | | Expenses | Net Liquidation Value |
|---|---|---|---|
| Real Estate | $3,300,000 | $527,850 (RE Comm. $247,500, Trustee Comm, $106,350, Cap. Gains Tax $180,000) | $2,772,150 |
| Farm Vehicles | $427,975 | $82,065 (Trustee Comm. $14,490, Sale Commission $67,575) | $345,910 |
| A/R | $100,000 | $30,000 (Collection & Bad Debt) | $70,000 |
| _____ | | | |
| _____ | | | |
| _____ | | | |
| Farm Equipment | $763,325 | $154,685 ($5000 trustee atty. $29,160 trustee comm. $120,485 Sales comm.) | $608,640 |
| Total | $4,591,300 | $794,600 | $3,796,700 |

| | |
|---|---|
| Total liens with interest | $3,313,000 |
| Priority claims w interest | $303,150 |
| Attorney's Fees | $35,000 |
| Highland Hill lien | $unknown |
| | |
| Possible net funds after expenses | $145,550 |

All other equipment and crops are either surrendered or they have been disposed of pursuant to cash collateral orders or motions for relief from the automatic stay.  There was no equity for the unsecured creditors in the returned property, nor in the property used as the result of the cash collateral orders.

(L.F. 27 Rev. 12/09)

(L.F. 27 Rev. 12/09)